# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ELOISE LOCKHART

              Plaintiff,

    v.

HSBC FINANCE CORPORATION, HSBC )
MORTGAGE CORP, HOUSEHOLD FINANCE )
CORPORATION III, MERSCORP INC., MERS, )
FREEDMAN ANSELMO LINDBERG LLC; STEVEN )
C.LINDBERG, JANE & JOHN DOES 1-10 )
AS AGENTS AND/OR EMPLOYEES )
RELATED TO HSBC, FREEDMAN ANSELMO )
LINDBERG, AND MERSCORP INC; BRADY )
PILGRIM, CHRISTAKIS BELL LLP, JEFFREY )
PILGRIM; JANE AND JOHN DOES 1-10 AS )
AGENTS AND /OR EMPLOYEES RELATED TO )
DEFENDANTS BRADY PILGRIM CHRISTAKIS BELL

              Defendants

13CV9323
JUDGE DURKIN
MAG. JUDGE GILBERT

FILED

DEC 30 2013

CLERK, U.S. DISTRICT COURT

## VERIFIED COMPLAINT
### INTRODUCTION

1.    Plaintiff brings this action to recover monetary damages and for injunctive and declaratory relief to address Defendants ongoing illegal, criminal and unethical activities including inter alia the Defendants collection of unlawful debt and to end Defendants pattern of racketeering activity all of which violates the Racketeer Influenced and Corrupt Organizations Act , 18 U.S.C. S.1962 ("RICO"), the Truth in Lending Act, 15 U.S.C § 1601 et seq. ( TILA"), as amended by the Home Ownership Equity Protection Act, 15 U.S.C §§ 1635, 1639, & 1640 ("HOEPA"), Civil Rights Act , 42 U.S.C §§ 1982,1983, the Fair Housing Act, 42 U.S.C. § 3601, et seq. ("FHA"), the Real Estate Settlement Protection Act, 18 U.S.C. § 2601 et seq. ("RESPA"), the Fair Debt Collections Practices Act ("FDCPA"), the Illinois Interest Act and the Illinois consumer Fraud Act, 815 ILCS 505/2 ("ICFA").

1

2.     Eight years ago beginning in about March, 2005, the law firm of Freedman Anselmo Lindberg and Rappe ("FAL&R"), and Household Bank Corporation ("HSBC") and its wholly owned subsidiary Household Finance III (collectively "HSBC") and Merscorp Inc ("MERS") entered into a conspiracy to steal the equity in Plaintiff's home by manufacturing a default which did not exist and filing unlawful foreclosure actions which they had no standing to file. Four years into the unlawful foreclosure collection activity, another law firm, Grady Pilgrim Christakis and Bell ("GPCB") joined the conspiracy. These Defendants unlawfully employed and continue to unlawfully employ, the United Stated Mail, the Illinois State Courts, forged mortgage documents, fabricated assignments, perjured affidavits and fraud in their ongoing attempt to illegally foreclose on Plaintiff's property and to evict her from the property which she had owned for more than thirty years. These actions are in violation of Plaintiff's constitutionally protected rights to due process and equal protection of the law.

## JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction over this action pursuant to Federal Question under 28 U.S.C § 1331, 18 U.S.C.A. §§1961-68,15 U.S.C. §§ 1692 et seq., 12 U.S.C. §§ 2605-2608,42 U.S.C.SS 1982 ,1982 et seq., 42 U.S.C. § 3617 , 18 U.S.C. §§ 1341 and 1343). The court has pendant jurisdiction over the state law claims.

4.     Venue and personal jurisdiction in this District is proper because:

    a. Defendants systematically conduct and transact substantial business in this State and District as Illinois State licensed attorneys, licensed banks and corporations organized and operating in the State of Illinois and

    b. The causes of action occurred in this District

    c. The subject properties are located in this District

## PARTIES

5.     Plaintiff, Eloise Lockhart, is a 67 year old African American individual, licensed to practice law in Illinois beginning in 1979 and in Texas in 1986. She currently resides in Irving, Texas.

6.     Defendant HSBC Finance Corporation ("HSBC") is a corporation organized under the laws of the State of Delaware and maintains a principal place of business at 2700 Sanders Rd.

2

Prospect Heights Illinois, 60070. At all times relevant to this action HSBC transacted substantial banking business in the State of Illinois and in the Northern District with banks located in the State of Illinois and Cook County and has been engaged in the business of issuing and/or servicing loans throughout Illinois and throughout the United States, that violate the laws identified herein.

7. HSBC, now a British company, headquartered in London and widely reported to be Europe's biggest bank, has a long history of victimizing U.S. homeowners through the use of predatory lending schemes and tactics that mirror the type of fraud used against Plaintiff herein and which is more fully outlined below. HSBC operates in the U.S. as HSBC Finance and HSBC Bank USA.

8. The bank admitted to 36,000 instances in which it had violated California state lending laws and regulations and agreed with California's Department of Corporations to stop the violations. However, California sued HFC (now HSBC) in 2001 after discovering that the company failed to comply with California lending laws, but as Commissioner Demetrious put it, "Not only did Household fail to comply, but it began practicing even more abusive procedures and passed these practices on to it's sister corp. Beneficial Finance, Inc.   As a result, African-Americans, Latinos and economically disadvantaged Californians found themselves nickeled and dimed by a 26 billion dollar company. http:www,corp.ca.gov/pressrel/itn0111701."

9. In 2002 HSBC, then called HFC, paid a record $400 Million fine to settle charges that it engaged in predatory lending by intentionally misrepresenting the interest rates and fees charged to customers of mortgage loans as well as prepayment penalties and their application to loans, monthly payment amounts, costs of insurance and other loan terms. Borrowers complained that HFC caused their monthly payment amount to "jump" by adding insurance fees which they had not authorized and that prepayment penalties were imposed on their loan without their knowledge and that in many instances these fees violated state law. The homeowners further complained that HSBC mislead them about their loan's true interest rate. (See the Washington Report). The Washington Department of Financial Institutions, Expanded Report of Examination for Household Finance Corporation III as of April 30, 2003, found at

3

www.nclc.orglimages/pdf unreported/report-examination-for-household finance-corporation

pdf, as of April 30, 2002. Concluded that "The inclusion of unwarranted or unneeded insurance

products,.. misrepresentations or out and out fraud through forgery appears to be part of HFC's

practice of obtaining maximum revenue from consumers regardless of any actual benefit to the

consumer."

10.     Aside from the Wa. Report, HSBC's illegal predatory lending practices have been well

documented in other agency reports as well as lawsuits filed in the state of Illinois.

11.     HSBC consistently included prepayment penalties in loans to thwart customer's abilities to

refinance their loans, routinely failed to make disclosures required under HOEPA, and included

prepayment penalties which violated HOEPA.

12.     Customers from remotely different locations complained about the "same thing in the same

way" lending credibility to the claims of the borrowers, according to published reports. HSBC

was consistently accused of making dishonest statements about rates and fees, prepayment

penalties, monthly payment amounts, insurance or other loan terms.

13.     In December, 2012, the chief of Britain's HSBC branch confirmed that the bank would pay a

record 1.9 billion to settle charges relating to a money laundering scheme in the U.S. The

executive admitted to U.S. Senators that staff at its global subsidiaries laundered billions of

dollars for drug cartels and terrorists including the terrorists organization known as Al Qaeda

which took credit for the terrorists attack on the twin towers in N.Y. A Senate investigator stated

that HSBC was accused of taking "every imaginable form of illegal and illicit business and

violating every law in the books". Too Big to Fail (www.Guardiancouk).

14.     Household Finance III is a wholly owned subsidiary of HSBC It has a location at 2700 Sanders

Rd., Prospect Heights Illinois, and claims to engage in consumer finance. HSBC Finance,

Household Finance Corp. and Household Finance III will be referred to collectively as" HSBC".

15.     Defendant Merscorp Inc. is a foreign corporation located at 1818 Library Street, Suite 300,

Reston, Virginia, transacting substantial business in the State of Illinois and the Northern

District as a foreclosure industry registration service that is the sole shareholder of Defendant

Mortgage Electronic Registration Systems Inc. Merscorp and Mortgage Electronic Systems

Inc. will be referred to collectively as "MERS".

16.     Members of Defendant MERS are mortgage originators, mortgage servicers and sub-servicers, warehouse lenders, wholesale lenders, retail lenders, settlement agents, title companies, insurers, and investors who act as agents of Defendants MERS.

17.     At all times relevant herein, Defendant MERS was under the direct control of HSBC, one of many members of MERS that own operate, control, manage and direct the activities of MERS.

18.     According to HSBC's annual regulatory filing with the Securities and Exchange Commission (SEC) on about. March 1, 2011, HSBC received cease and desist letters from both the Federal Reserve and the Office of the Comptroller of the Currency (OCC) which outlined problems in the company's processing, preparation, and signing of affidavits and other documents supporting foreclosures, and in HSBC's management of third-party law firms retained to carry out foreclosures. HSBC stated that they were reviewing foreclosures which were in process where judgment had not been entered and would correct deficient documentation and re-file affidavits where necessary.

19.     HSBC has never re-filed any of the affidavits Defendant's filed with respect to their foreclosure filings against Plaintiff.

20.     The statement went on to say that "We have suspended foreclosures until such time as we have substantially addressed noted deficiencies in our processes."

21.     HSBC never suspended the foreclosure pending against Plaintiff.

22.     When cease and desist orders were issued against Defendant's HSBC and MERS, in about April, 2011. the Defendants were ordered to send notice to borrowers in foreclosure or foreclosed between January 2009 and December 31, 2010, advising the borrowers that they were eligible to request an " independent foreclosure review" so that someone other than HSBC would determine if for example,

(a) the foreclosure action was initiated against the borrower on behalf of an entity that did not have standing because the entity did not own the obligation sued own.

(b) whether borrowers were placed in default status because of the imposition of improper fees which made it appear that the borrower was in default when no actual default existed and

(c) whether or not affidavits had been filed in the foreclosure actions by individuals who claimed to have personal knowledge when the affiants had no such knowledge and had not reviewed the loan records.

23.     Defendant's waited until June, 2012 to send Plaintiff the required notice, which was after the initial period to request the review had expired.   Upon receipt of the notice, through investigation of the review process. Plaintiff learned that, like herself, thousands of Illinois customers could have been subject to HSBC's and MERS illegal servicing activities.

24.     On information and belief, HSBC's role with respect to Plaintiff's mortgage was to collect and promptly credit funds received from the Plaintiff, and distribute the funds to the appropriate parties.   Imposition of late fees, force-placing hazard insurance at the homeowners expense, and foreclosing on the property to satisfy a secured debt are actions which were only authorized by the mortgage agreement upon actual default and not pursuant to the default which HSBC manufactured with respect to Plaintiff's mortgage.

25.     HSBC took the unlawful, criminal actions, which are more fully explained below, not in response to a default on Plaintiff's part, but for financial gain at Plaintiff's expense.

26.     On information and belief the actions as outlined below were not only unlawful and criminal, but had a discriminatory impact on the protected group of which Plaintiff is a member, rendering Plaintiff's home unavailable in violation of the FHA.

27.     Plaintiff is not currently aware of the of the racial breakdown of the borrowers affected by the so called Independent Foreclosure Review, that information is exclusively within the control of HSBC and will be revealed pursuant to discovery in this lawsuit.

28.     In 2007, the NAACP filed a class action lawsuit against HSBC and fourteen other lenders to end what was deemed "systemic, institutionalized racism in making home mortgage loans." Data collected in 2005 during a study by the Center for Responsible living (CRL) found that African American borrowers living in the Chicago metropolitan area, as well as other areas, were twice as likely to receive high cost loans as were whites with the same risk factors. In addition to carrying higher interest rates, subprime loans to African- Americans are typically laden with improperly disclosed fees, including excessive prepayment penalties, which

prevented borrowers from refinancing at a fairer rate.

29.      The National Community Reinvestment Coalition found in a study released in 2007 that HSBC was among lending institutions in six major metropolitan areas, including Chicago, engaged in "pervasive discriminatory and predatory practices, by making high cost subprime loans to higher qualified African-Americans 54 percent of the time compared to 23 percent of the time to Caucasians, even when the latter group was less qualified. See http://www.mortgagenewsdaily.com/7162007_Subprime_Lawsuit.asp

30.      The enforcement action issued against HSBC required the loan servicer to "look back" at loans serviced, in foreclosure or foreclosed between January 2009 and December 31, 2010 to determine, among other things, whether borrowers who were not in default were placed in foreclosure, and whether foreclosure actions were initiated by entities who did not have standing to foreclose because they did not own the mortgage and Note at the time that foreclosure actions were initiated, or because the Notes, in some instances had been paid and were no longer outstanding.

31.      The OCC enforcement action required HSBC and or MERS to engage an independent firm to conduct a review of the foreclosure actions and if any foreclosure actions were improper, HSBC was to take action to remediate the borrower for any financial injury caused by the alleged servicing "error" by ceasing foreclosure actions which were improper but ongoing and where such foreclosures had already been completed Household was required to remediate those homeowners for the loss of their homes. See **Exhibit 1** is a congressional letter providing a history of the enforcement action.

32.      In about June, 2012, after receiving notice from the Independent Review Administrator, Defendant learned that she was among thousands of homeowners in the United States whose foreclosures were eligible for independent review and possible "compensation or other remedy."

33.      The financial remediation sent to Plaintiff in April, 2013 was a payment of $2,000 without explanation as to how that figure was arrived at, except to note that litigation concerning the foreclosure was ongoing.

34. On information and belief HSBC makes hundreds of billions of dollars annually some of which is earned by illegally, fraudulently and discriminatorily foreclosing on homeowners across the United States using the same schemes used against Plaintiff and the thousands of other homeowners whose loans were the subject of the foreclosure review.

35. Freedman Anselmo Lindberg and Rappe ("FALR or FAL") is a law firm organized as an Illinois corporation with offices located at 1807 Diehl Rd., Naperville, IL. 60563

36. FAL is engaged in the business of using the mails and telephone to collect consumer debts originally owed to others, including residential mortgage debts and at all times relevant to this action, conducted substantial business in this district filing foreclosures and default documents in the courts and with the County Clerk's office in this District.

37. FAL is a debt collector as defined in the FDCPA.

38. Defendant Steven C. Lindberg is an Illinois licensed attorney who participates in the operation and or management of FAL.

39. Defendant Douglas A. Oliver Esq. and Jane and John Does 1-10 as agents and/or employees of FAL and/or licensed attorneys who work under the direct supervision, management and control of Defendants FAL as co-conspirators to the acts alleged herein that occurred throughout the State of Illinois and in this District. Jane and John Does identities are to be discovered in this action.

40. Defendant Jeffrey D. Pilgrim is an Illinois attorney who participates in the management and or the operation of Grady Pilgrim Christakis Bell ("GPCB"), a law firm, located at 53 West Jackson Blvd. Suite 1515, Chicago Illinois 60604.

41. According to the GPCB website, they specialize in commercial litigation, consumer finance law and real estate business information. Jane and John Does 1-10 as agents and or employees of GPCB work under the direct supervision management and control of Defendant Pilgrim as co-conspirators to the acts alleged herein that occurred throughout the State of Illinois and in this District.   Jane and John Does identities are to be discovered in this action.

42. Each of the fictitiously named Doe Defendants is responsible in some manner for the events and occurrences alleged herein and/or at relevant times acted as an agent and/or conspirator

with HSBC, MERS and FAL and such acts occurred within the course and scope of said

agency, conspiracy or enterprise, and with the express and/or implied permission, knowledge,

consent, authorization and ratification of HSBC; however each of these allegations are

deemed alternative theories whenever not doing so would result in a contradiction with the

other allegations.

43.    The allegations by Plaintiff concerning her own acts and the wrongful acts of Defendants that

damaged Plaintiff's interests are made based on Plaintiffs personal knowledge. Plaintiffs

allegations which are based on information and belief are derived from an investigation

undertaken by herself and her attorneys, which includes, among other things (1) interviews of

witnesses: (2) review and analysis of court and other public records: and (3)   review and

analysis of legal journals, Congressional testimony, news media reports and published

commentaries disseminated by other public agencies. Additional evidentiary support

confirming the truth of the allegations in this Complaint will be established through discovery

from Defendants and other non-parties with knowledge of the systematic criminal,

discriminatory and unethical conduct alleged herein.

## FACTS

44.    On October, 1973 plaintiff as co-owner purchased a home in a predominately African

American neighborhood, located at 2020-22 W. 80th Street in Chicago, Illinois, for use as the

residence for herself and her family.   Plaintiff's property spans two lots. The residence sits on

the lot designated 2022 W. 80th Street ( pin 38) and the driveway is designated 2020 W.80th

street PIN-39

45.    Over the course of the 30 year period leading up to May, 2003, by always timely meeting her

obligations under her mortgage and note, Plaintiff accumulated considerable equity in the

home so that in 2003, she estimated its fair market value to be from $150,000 to $200,000.

46.    In May, 2003 Plaintiff owed about $31,650.00 on her existing mortgage and her note was about

to adjust (in June, 2003) so that her interest rate would be about 5.05000% and her monthly

mortgage payment would have been about $564.00 per month, including taxes and insurance.

47.    On about April 24, 2003, Fieldstone Mortgage ("the lender"), through a broker, obtained

Plaintiff's credit report without Plaintiff's knowledge or consent.

48.     In May, 2003, Plaintiff was sent a flyer by the broker acting as agent for the lender, stating that
        she had been pre-approved for a loan, that the lender was a direct lender (meaning that the
        lender did not use a broker) and would not charge excessive fees to refinance her mortgage
        loan.

49.     On May 19, 2013, plaintiff telephoned the number provided in the lenders flyer and was
        immediately connected to a broker.

50.     On May 19, 2003 Plaintiff applied for a loan from the lender. The TILA disclosure statement
        reflected that the loan would be fixed at 8.625% over a period of thirty years, and that the loan
        did not have a prepayment penalty.

51.     On May 29, 2003 Plaintiff as Mortgagor executed Mortgage and Note wherein Plaintiff
        promised to pay the lender $ 105,000 at a fixed rate of 8.625% annual interest over a period of
        30 years for monthly payments of $987.00 which included amounts to be escrowed for taxes
        and insurance. Attached as **EXHIBIT 2** is a copy of the Mortgage.

52.     The lender imposed a prepayment penalty and other charges were required to be prepaid
        before Plaintiff could get the loan.

53.     Points and fees, including prepaid finance charges, compensation paid to the mortgage
        broker, and amounts paid to a lender affiliate exceeded 8%.

54.     The Escrow Account Disclosure Statement, provided at closing reflects that $168.53 would be
        added to the monthly principal and interest payment for the purpose of paying county taxes of
        about $100.00 and hazard insurance of $66.00 as they became due on the property.

55.     In 2004, Plaintiff received notice that her taxes on the property were delinquent and later
        received notice that her property would be sold because the taxes had not been paid

56.     The $168.53 collected monthly from August, 2003 to May, 2005 by HSBC as servicer on the
        loan to be used as payments for taxes and insurance was not used for that purpose.

57.     In October, 2004, Defendants HSBC raised Plaintiff's monthly mortgage payment by more
        than $500.00 per month.

58.     As servicer, HSBC was allowed to force place insurance, to protect the lender's interest only if

the borrower had allowed the insurance to lapse or was in default.

59.    By charging Plaintiff unreasonably inflated insurance premiums, paid through to an affiliate, HSBC was able to generate additional profits at Plaintiff's expense.

60.    In December, 2004, Plaintiff notified HSBC that she had cancelled the force placed insurance and obtained replacement insurance with Allstate Insurance and in February 2005, by letter HSBC, acknowledged that Plaintiff's escrow accounts were closed and that her monthly mortgage payment was $815.00 per month.

61.    However after February, Defendant's continued to claim that the rightful mortgage payment was $1,350.00 per month.

62.    In about March, 2005, Plaintiff called a hotline number (611), set up by Mayor Daley for homeowners in foreclosure distress.

63.    Plaintiff, a counselor with the hotline, and an employee of HSBC engaged in a three way conference.

64.    HSBC's representative stated that Plaintiff was two payments in arrears and that she owed $1,350.00 for the months of February and March, 2005 ($1,350.00x2) and that as of April, 2005 Plaintiff would be three months in arrears. She further advised that if the two payments were not received by April 1, 2005, the loan would be referred to foreclosure according to HSBC's policy of referring accounts for foreclosure which were three months in arrears.

65.    Plaintiff agreed to send two payments of $1,350.00 by April 1, 2005, to avoid having the loan referred for foreclosure. In exchange, HSBC agreed to investigate Plaintiff's claim that her proper monthly payment was about $815.00 and not $1,350.00 which improperly included escrows for insurance and taxes.

66.    On about March 29, 2005 Plaintiff sent the requested two payments, but when she spoke to HSBC on March 31, 2005 the payments which were sent by express mail had not arrived. Plaintiff later traced the March 29, 2005 payment and learned that it was delivered to HSBC on April1, 2005.

67.    Plaintiff was advised that she had to re-send the payments through Western Union on the eve of March 31, 2005, so that the alleged arrearage would be cured before April1, 2005 to prevent

the loan from being referred for foreclosure.

68. By April 1, 2005, Defendant HSBC had been sent, by Western Union and U.S. Mail, at least four payments ($1,350.00 x 4) which should have more than cured any alleged default.

69. After HSBC received the alleged arrearage as outlined above, they did not use the payments to cure the alleged arrearage.

70. On April, 2005 HSBC force placed insurance in the amount of $2,300.00 and subtracted the force placed premium from the payments which HSBC received on March 31, 2005 and April 1, 2005 which HSBC claimed would cure the alleged default.

71. Pursuant to her request, on about April 15, 2005, Plaintiff received a statement of her account from HSBC which reflected that her mortgage payment was $815.00 per month.

72. On May 19, 2005 Defendant Lindberg wrote to Plaintiff via the U.S. mail, as a debt collector for HFC III whom he claimed owned Plaintiff's Note. According to the letter, the owner was exercising the right to accelerate the Note demanding that Plaintiff pay the $108,977.59. Defendant Lindberg went on to state that depending on when she paid the amount stated she might actually owe more than the figure quoted in the letter.

73. The letter also stated that Plaintiff had 30 days to dispute the action under Federal law, during which time, Attorney Lindberg would send Plaintiff proof of the debt and take whatever actions "as required by law".

74. After receiving the above referenced letter, Plaintiff sent Attorney Lindberg a letter disputing the debt and providing him with the money order number of at least one $1,000.00 payment which Defendant HSBC had failed to credit to her account in 2004.

75. On or about May 25, 2005, without waiting for the expiration of 30 days, and without responding in any way to Plaintiff's letter disputing the debt, Defendant Lindberg filed an unverified foreclosure complaint, 05 Ch 9047 (" case one"), It was styled Mortgage Electronic Systems, INC As Nominee For Household Finance Corporation III,

76. On July 5, 2005 Plaintiff filed a verified answer to case 1 in which she denied, under oath, that MERS/HFCIII was the lender on the mortgage as claimed, that the mortgage had been recorded with the Recorder, that 2022 was covered by the mortgage, and she denied that she

12

was in default as MERS/HFC III claimed in their complaint.

77.     Case 1 was in two counts. In count two, Defendants sought to reform the mortgage to include 2022 w. 80th street which stricken from the mortgage by the lender at closing.

78.     A Plaintiff must allege in its foreclosure complaint the capacity in which it brings the foreclosure case pursuant to the Illinois Mortgage Foreclosure Law ( "IMFL") 735 ILCS 5/15-1504.

79.     In case 1 Defendants HSBC alleged that they owned and held the mortgage and note as mortgagee on the May 29, 2003 Mortgage.

80.     This was not true,

81.     Pursuant to the Mortgage, the lender was Fieldstone and Fieldstone held the mortgage and Note.

82.     According to the welcome letter sent to Plaintiff on September, 2003, HSBC was, at most, the servicer on the mortgage.

83.     Pursuant the IMFL, Defendants were also required to attach to their foreclosure complaint, a true and correct copy of the Mortgage and Note and to provide the date and place of the recording of the Mortgage and the identification number of the recorded Mortgage.

84.     The alleged copy of the Mortgage, attached to Defendant's initial foreclosure complaint, bears a recording identification number of 0315726217.

85.     The number 0315726217 identifies another mortgage, covering a condominium property in Oak Park, Illinois having nothing to do with Plaintiff's property.

86.     On information and belief, Defendants altered Plaintiff's Mortgage by attaching the false recording identification to make it appear that Defendants MERS/HSBC had standing as record lien holders when they had no such standing.

87.     The false recording number only appears on page 1 of the mortgage.   On information and belief, mortgages which are actually recorded with the Recorder of Deeds bear the recording identification number on each page of the recorded document.

88.     Additionally the recording fee which is stamped along with the alleged number does not match the fee which would have been required to record Plaintiff's mortgage and Note, and no fee was paid to return the allegedly recorded document back to the party who allegedly sent the

mortgage to be recorded.

89.    Illinois courts consistently hold that a mortgage is a lien for purposes of foreclosure from the

time it is recorded and not before.

90.    On July 5, 2005, Plaintiff filed a verified Answer to case 1 in which she denied under oath, inter

alia, that MERS/HFC III was the lender on the mortgage as claimed in the complaint, that the

mortgage had been recorded with the recorder of Deeds as alleged and also denied that she

was in default as Defendants alleged and that 2022 W.80th Street was part of the mortgaged

property.

91.    About ten days after Plaintiff filed her verified Answer as referenced above, on about July 15,

2005, Defendant Lindberg filed an unverified motion to voluntarily dismiss case 1 without

prejudice to his right to re-file.

92.    In his motion filed with the court, without prior notice to Plaintiff, Defendant Lindberg claimed

that the loan had been reinstated.

93.    This was not true.

94.    Additionally, on virtually the same day that Defendant Lindberg procured the voluntary

dismissal of case 1, HSBC wrote to Plaintiff claiming that she owed in excess of $7,000.00 in

arrears under her mortgage obligation and that the payment was due by August 1, 2005 in

order to cure the default.

95.    Attorney Lindberg misrepresented the status of the loan which allegedly was owed to his client

intending that the court rely on the misrepresentation and dismiss case 1 without prejudice to

his right to re-file.

96.    Plaintiff was harmed by this fraud in that the court relied on the fraud and dismissed case one

without prejudice to Defendant's right to re-file and without requiring Defendants to reimburse

Plaintiff for her filing fees and other costs incurred in responding to case 1.

97.    Because the dismissal was without prejudice, Defendants were allowed to re-file their

complaint.

98.    On August 2, 2005, 16 days after case one was dismissed, and about one week after

Defendant Lindberg allegedly closed his file in the matter, he again wrote to Plaintiff as debt

14

collector for MERS/HFC III.. The letter stated that Plaintiff owed $112,226.12 because Plaintiffs

Note had been accelerated due to Plaintiff's alleged default.

99.     On about August 5, 2005, Defendants MERS and HSBC filed the second foreclosure action,

05-Ch-13290. ("case 2").

100.    Case 2 was in one count and substituted a legal description, encompassing both lots, in place

of the original 15th page of the mortgage which was executed without a legal description.

101.    In Answer to case 2, Plaintiff filed a second verified Answer in which she denied inter alia, that

Defendants MERS/HSBC had standing as record lien holders and filed additional

counterclaims and affirmative defenses,

102.    After Plaintiff filed her answer to case 2, in about September, 2005, Defendant Lindberg filed

an affidavit for prove-up pursuant to 735 ILCS 5/15-1506 along with motions for judgment of

default in case 2.

103.    Defendant Lindberg's affidavit purported to be based upon personal knowledge and sought

specified damages in dollar amounts on behalf of MERS whom he alleged to be the owner and

holder of a recorded mortgage on Plaintiff's property.

104.    The mortgage had never been recorded as Defendant swore and Defendant knew that MERS

had no interest in the Mortgage.

105.    Illinois courts consistently hold that a mortgage is a lien for purposes of foreclosure from the

time that it is recorded and not before.

106.    By falsely claiming that the mortgage was recorded, the Defendants were able to convince the

foreclosure court that they had a right to invoke the jurisdiction of the court, when they knew

that they had no such right.

107.    By falsely claiming to be the original lender, Defendants MERS/HSBC avoided having to show

that they were assignees on the Note.

108.    Defendants knew they filed false and fraudulent documents with the court and county clerk to

foreclose on Plaintiffs property.

109.    Defendant's participated in a scheme to file fraudulent foreclosure documents against Plaintiff

to extract money and her property from her knowing the Mortgage was never recorded and

was never assigned to Defendants and that Defendants had no standing to file a foreclosure.

110. Plaintiff was damaged as she was unable to sell her home, which she had listed with a real estate broker and has been forced to engage in protracted litigation over a period in excess of 8 years in order to prevent Defendant's from illegally foreclosing on her property.

111. On about May 1, 2006, within three years of the May, 29, 2003 closing and while case II was pending, Plaintiff advised Defendants that she was exercising her right to rescind the loan. See **Exhibit 3**.

112. Although the notice of rescission was received by Defendants on May 1, 2006. Defendant Douglas Oliver waited until June 1, 2006 to respond to the notice of rescission.

113. Knowing that Plaintiff had the legal right to rescind up to three years after the transaction, the Defendant Attorney advised Plaintiff by letter that she only had three days to cancel the loan.

114. Defendants, according to Defendant Oliver, provided Plaintiff with only one federal Notice of Right to Cancel in a form that she could keep, instead of the two required under federal law.

115. Illinois Federal Courts and State Courts consistently hold that the failure to provide two copies of the right to rescind triggers a three year right to rescind the loan.

116. On about, June 11, 2007 both Plaintiff and Defendants voluntarily dismissed their respective cases.

117. Fifteen days later on, June 26, 2007, Defendants FALR (Attorney Lindberg) as debt collector for Defendants HSBC sent Plaintiff a letter stating that HSBC was the holder of a mortgage and Note on her property and that she was in arrears on the Note in the amount of at least $139,140.30. The letter did not reference monthly payment amounts, only the accelerated debt.

118. On or about September 7, 2007, Defendants filed their third foreclosure complaint, (case three) 07-Ch 24236, which is currently pending in state court

119. Case III was styled Household Finance Corporation III v. Plaintiff, et al. Defendant HSBC claimed that they were the mortgagee by virtue of an assignment from MERS to HFC. **Exhibit 4** is a copy of the alleged assignment.

120. The alleged date that Defendant's HSBC were assigned the Mortgage and Note was blank.

121.  Upon information and belief, such an assignment, failing to state when the alleged property was transferred, does not confer standing and Defendants, HSBC, MERS, FAL and GPCB violated 225 ILCS 425/8b, of the Illinois Collection Agency Act, by filing suit without an assignment in the form specified therein.

122.  On July 19, 2011, Defendants HSBC filed yet another "assignment" with the Recorder of Deeds for Cook County, Illinois. **Exhibit 5**

123.  This alleged assignment claimed that HSBC had been assigned the Mortgage (not the Note) from the lender on July 19, 2011, in the State of New York. July 19, 2011. On that same day the "assignment" was apparently wired to the Recorder of Deeds in Cook County Illinois. The "assignment" in the form of an affidavit, states that Allan Keohane "Assistant Secretary" executed the affidavit on January 31, 2012 in Erie County, New York. However the unexecuted document had been on file with the Recorder of Deeds for Cook County since July 19, 2011, as the "Assistant Secretary's " signature does not appear anywhere on the document.

124.  The Notary on the July 19, 2011 "Assignment" was a fraud.

125.  On July 8, 2010 the Judge in the pending foreclosure action, ordered Defendant Attorney Norman, to provide a history of litigation with respect to the foreclosure actions which her client had filed against Plaintiff.

126.  On August 26, 2010 Attorney Norman acting under the direction and supervision of Defendant Pilgrim filed a motion claiming that HSBC filed their initial foreclosure complaint in August, 2005.

127.  735 ILCS 5/13-217 provides in pertinent part that a plaintiff who voluntarily dismisses a suit may commence a new action within one year or within the remaining period of limitations, whichever is greater.

128.  Illinois courts consistently interpret this to mean that a plaintiff who voluntarily dismisses a suit may commence only one new action and not two as Defendants had with the filing of case the pending foreclosure action.

129.  After being advised that Defendants had never filed a verified Answer to Plaintiff's counterclaims which had been filed in March, 2008, the trial Judge gave Defendants until

December 10, 2010 to file a verified Answer to Plaintiff's counterclaims.

130. Acting under the direction and supervision of Defendant Pilgrim, attorney Norman ignored the judge's orders and instead wrote to Plaintiff stating that HSBC did not need to file a verified Answer.

131. As of the date of this law suit (December,2013) Defendants still had not complied with the courts order to file a verified Answer in connection with the foreclosure lawsuit pending in State court , preventing that litigation from going forward.

132. In pursuit of the collection of the usurious unlawful debt and to continue their illegal RICO scheme, the attorneys fraudulently disregarded the Illinois statute (735 ILCS 5/2-605) requiring that their pleadings be verified under oath in response to Plaintiff's verified pleadings. Defendant's January 26, 2010, 2-615 motion for judgment on Plaintiff's verified pleading was unverified and filled with material misrepresentations and outright lies regarding the facts and regarding the actual holdings in key cases cited for the purpose of obtaining a favorable ruling from the trial court, which rulings were obtained to Plaintiff's detriment, in many instances.

133. Defendants continued to fraudulently file unverified papers, as described above, whenever they responded to Plaintiff's verified motions for dismissal of their case and her motions for summary judgment during 2011. When the judge ordered verified responses, Defendant's resorted to oral motions, which they made without prior notice to Plaintiff which were also unverified and violated Plaintiff's right to due process.

134. In June, 2011, Plaintiff served Defendants discovery requests seeking to discover any "proof of ownership of the Mortgage Note and proper transfers".

135. Defendant's answered the June, 2011 discovery requests on September 8, 2011 (four years and one day after the pending foreclosure action was filed), with prevarications and evasion. Additionally the Answers were not verified as required by Illinois civil procedure.

136. Seven years and three requests later, Defendants have yet to produce any proof that they ever had or ever believed they had any legal right to foreclose on Plaintiff's property.

137. On February 14, 2012, defendant Jeffrey Pilgrim filed a motion with the Appellate Court of Illinois to dismiss Plaintiff's interlocutory appeal of a September 26, 2011 order issued by the

foreclosure judge.

138.    Defendant Pilgrim fraudulently claimed that the September 26, 2011 order denied Plaintiff

further leave to amend her counterclaims. This was not true. The order granted Plaintiff leave

to amend her claim under the Illinois Interest Act .Attorney Pilgrim's false claims were meant to

imply that the trial court considered Plaintiff's claims frivolous, so that the appellate court would

not examine its jurisdiction with respect to other orders leading to the order appealed from.

139.    On February 14, 2012, Attorney Sulejman F. Dizdarevic, acting as agent, under the direction

and supervision of Defendant Pilgrim filed a false affidavit in which he swore that the false

statements contained in Defendant' Pilgrim's motion were true.

140.    Further, Attorney Dizdarevic falsely and fraudulently claimed that Plaintiff's July, 2008, 2-1005

motion for Partial Summary Judgment had not attached the exhibits reference in the motion.

141.    Those statements were not true as Defendant knew the exhibits were attached and had

admitted that the summary judgment motion attached the referenced exhibits in their response

to the motion filed in 2008.

142.    Defendants intended to cause Plaintiff severe emotional distress or they knew that there was a

high probability that their conduct would do so.

143.    Plaintiff has suffered severe emotional distress due to Defendant's unlawful, unethical and

criminal actions which have damaged Plaintiff.

144.    At the time that Defendant's initiated their unlawful conspiracy to manufacture a default, take

and sale Plaintiff's home, she had her home listed with a realtor for $174,000.

145.    Defendants FAL and HSBC filings interfered with her right to sell her home and she was unable

to sell her home and has been forced to engage in protracted litigation, over a period of more

than eight years suffering financial loss and severe emotional distress, to prevent the

Defendants from illegally taking her home.

146.    In furtherance of their scheme to unlawfully foreclosure on Plaintiff's home, and to collect on

the unlawful usurious note, each month, including December, 2013, Defendants have

fraudulently employed the U.S. Mail to send fraudulent collection notices and notices advising

of late fees, and other letters in the guise of monthly mortgage statements, when the debt was

accelerated and no monthly mortgage amounts are due.

## STATUTORY FACTS

147.   Illinois criminal statutes relating to false filings, perjury and forgery exist to protect citizens and the judiciary from the consequences of these acts.

148.   A person commits the offense of unlawful clouding of title who intentionally records or files or causes to recorded or filed any document in the office of the Recorder of Deeds or registrar of titles of any county of this state that is a cloud on the title of land in this state, knowing that the theory upon which the purported cloud on title is based is not recognized as a legitimate legal theory by the courts of this state or of the U.S. commits the offense of unlawful clouding of title. Unlawful clouding of Title is a class 4 felony if the cloud on the title has a value that exceeds $10,000. 720 ILCS 5/32-13

149.   A person commits perjury when, under oath or affirmation, in a proceeding as in any other matter where by law oath or affirmation is required, he makes a false statement material to the issue or point in question, which he does not believe to be true. 720 ILCS 5/32

150.   Under Illinois Law 720 ILCS 5/17-3, a person commits the Illinois crime of forgery when with the intent to defraud, they knowingly

   (1)   Make or alter any document apparently capable of defrauding another in such manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give authority or

   (2)   Issues or delivers such document knowing it to have been thus made or altered.

151.   The Illinois criminal offense of Forgery is considered a class 3 Felony.

## DEFENDANT'S SCHEME

152.   Courts have dismissed numerous foreclosure lawsuits filed by so called "foreclosure Mills" such as FAL&R and others. The lawsuits were dismissed because HSBC and other lenders did not own the purported debt. In re Foreclosure Cases, 1:07CV2282 and 14 others, 2007 U.S. Dist LEXIS 84011, 2007 WL 3232430 (N.D. Ohio Oct.31, 2007): HSBC Bank USA v. Rayford, 3:07-CV-428, 2007 U.S. Dist.LEXIS 82625 (S.D.Ohio., Nov. 21, 2007): HSBC BankUSA. N.A. v. Valentin, 15968/07.2008 NY slip Op 50164U: 14 Misc.3d 1123A: 2008 N.Y. Misc. LEXIS 229

(Kings Co., N.Y. Su. Ct., January 30, 2008); HSBC Bank USA .N.A., v. Cherry, 21335/07, 2007 NY Slip Op 52378U: 18 Misc, 3d 1102A: 2007 N.Y. Misc. LEXIS 8279: 239 N.Y.L.I.2 (Kings Co., N.Y. Sup. Ct., Dec 17, 2007):

153. The court stated in In re Foreclosure cases, supra that "In each of the above captioned complaints, the named Plaintiff alleges it is the holder and owner of the Note and Mortgage. However, the attached Note and Mortgage identify the mortgagee and promisee as the original lending institution- one other than the named Plaintiff ."

154. The fraudulent foreclosure complaints, fraudulent and fictitious assignments, fraudulent affidavits and other false court filings are part of Defendants FAL's foreclosure mill practice, which upon information and belief, is a conspiracy between the defendants to unlawfully extract money and property from Plaintiff and thousands of other homeowners throughout the State of Illinois.

155. Upon information and belief, Defendant's unlawful foreclosure scheme is part of a nationwide scandal on the part of the foreclosing Defendants, wherein HSBC filed foreclosure actions (about 43,442 foreclosures were initiated from January 1, 2009 to December 31, 2010 according to the OCC) without proof that they had standing to foreclose and/or in many cases where there was no actual default on the part of the homeowner, because HSBC imposed illegal fees precipitating a default.

156. Defendants knew they filed false and fraudulent documents with the court and county clerk to foreclose on Plaintiff's property.

157. Defendants participated in a scheme to file fraudulent foreclosure documents against Plaintiff to extract money and property from her knowing that the Mortgage had never been recorded and that therefore no lien had been created which the foreclosure court could lawfully foreclose.

158. Defendants knew that the fraudulent assignments which they created did not confer standing which enabled them to lawfully invoke the jurisdiction of the court.

159. Upon information and belief, Defendants Steven Lindberg and Jeffery Pilgrim acting by themselves or through or with the other persons, associations and /or companies, have

formulated, directed, controlled, or participated in the acts or practices of Defendants FAL, GPCB, MERS and all other Defendants named herein as set forth in this complaint, including developing, producing, creating and disseminating to Plaintiff false, fraudulent and deliberately deceitful (a) collection letters regarding impending foreclosures, (b) Lis Pendencies,(c) Summons and Complaints for foreclosure, (d) false assignments (e) Reinstatement letters and other legal documents filed with the courts and clerks in the state of Illinois.

160.    Upon information and belief, Defendant MERS and HSBC, acting by themselves or through or with others persons, associations and/or companies, have formulated, directed, controlled, or participated in the acts or practices of Defendants FAL and GPCB and all other Defendants named herein as set forth in this complaint, including developing, producing, creating and disseminating to Plaintiff intentionally false, fraudulent and deliberately deceitful (a) collection letters regarding impending foreclosures, (b) Lis Pendencies, (c) Summons and Complaints for foreclosure (d) false Assignments (e) Reinstatement letters and other legal documents filed with the courts and clerks in the state of Illinois

161.    Defendants, including the licensed attorneys, have abused the judicial process by filing false documents in the courts and with the county clerks.

162.    Upon information and belief, from on or about May, 2005 to date, Defendants engaged in a pattern and practice being a scheme to prey upon Plaintiff and other homeowners of the State of Illinois, the Illinois Judiciary and the County Clerks' by filing fraudulent foreclosure complaints, lis pendens, among other legal documents to complete the scheme, including collection letters to take Plaintiff's home, property, and money from her by using the federal wires and mail when they fax and e-mail the fraudulent documents to plaintiff, other counsel, the judiciary and clerks.

163.    By entering into their scheme of filing unlawful foreclosures, Defendant's FAL, and GPCB were and are able to secure a reliable source of income wherein Defendants FAL and GPCB get legal fees and other costs, and Defendant MERS also profits from the foreclosed properties by getting loans paid off based on their involvement with the fraudulent assignments, letters and foreclosure filings to take Plaintiffs home away and auction or sell it.

22

164. To further their scheme, defendants used the federal wires and mail to send false collection and payoff letters to Plaintiff on behalf of Defendants HSBC and MERS shareholders who had no right to collect.

165. The mails were used to send their false fraudulent payoff and other letters and court filings to Plaintiff, banks, title companies, attorneys, judges, and court clerks regarding their false foreclosure filings.

166. Defendants use wire transfers of monies they collect, received from their illegal collection of mortgage payments and foreclosures.

167. At all times relevant herein, Defendants knew it was unlawful, unethical and improper to deceive the public and the judiciary and that the conduct could lead to referral to a disciplinary committee and a risk of revocation or suspension of one or more of the conspiring Defendants' licenses to practice law and banking licenses of Defendant MERS and HSBC.

## STATUTE OF LIMITATIONS

168. Plaintiff repeats. Re-alleges and incorporates by reference the above allegations.

169. Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial and misleading actions, as alleged herein. Plaintiff was kept ignorant of information required for the prosecution of her claims, without any fault or lack of diligence on her part.

## COUNT ONE

(Racketeer Influenced and Corrupt organizations Act 18 U.S.C. § 1962 (a))

170. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

171. Plaintiff is a "person" within the meaning of 18 USC §§1961 (3) and 1964.

172. Defendants are "persons" within the meaning of 18 USC § 1961(3).

173. Defendants Lindberg and Pilgrim are the leaders, managers, organizers and controllers who influence the enterprise consisting of all other Defendants.

174. Defendants follow the directions of Defendants Lindberg and Pilgrim to file fraudulent foreclosures, false assignments, false letters and other false documents with the courts, county clerks to promote their scheme to defraud the public, Plaintiff, and the judiciary too

fictionalize foreclosures in the name of parties without standing, and to collect unlawful debts.

175.   With respect to Plaintiffs' claims under 18 U.S.C § 1962 (a) Defendants together constitute an "enterprise" as that term is defined in 18 U.S.C § 1961 (4). Through which Defendants, were and are engaged in interstate or foreign commerce and the activities of which affect interstate or foreign commerce.

176.   To Date the acts which are ongoing have lasted a substantial period of time and are pervasive as Defendants intend them to last indefinitely and to continue to victimize Plaintiff and on information and belief, thousands of other Illinois homeowners, attorneys and the judiciary by perpetuating their frauds and deceptions for profit.

177.   Defendants acting individually and/or by and through their officers and directors, engaged in a fraudulent scheme and common plan which included using or causing the interstate wires to transfer and obtain funds from fraudulent and unlawful collection activities and fraudulent foreclosures and by so doing they engage in multiple commissions of wire fraud involving the same and/or similar representations violating 18 U.S.C. §§ 1341 and 1341, and1343, and 15 U.S.C. §§ 45 and 52.

178.   This conduct constitutes predicate acts of racketeering activity within the meaning of U.S.C § 1961 (1).   All such instances were related in their common objective, or repeated on multiple occasions and are capable of further repetition, as a result of which they constitute a pattern of racketeering activity.

179.   Defendants and their respective agents have used or invested income derived from the collection of unlawful debt and from this pattern of racketeering activity in the enterprise in violation of 18 U.S.C § 1962 (a), including use of the proceeds of their racketeering activity to further their schemes.

180.   Plaintiff has suffered and continues to suffer injury and financial damage to her property by reason of Defendants' use or investment of income derived from the collection of unlawful debt and their pattern of racketeering and the enterprise, which used or invested enables the enterprise to continue its operations, and paid for Defendants' perpetuation of their fraudulent activities, as a result of which Plaintiff has been deceived into believing that she was in

foreclosure when the foreclosure documents were and are unlawful and Plaintiff was deceived into making mortgage payments to an entity which was not lawfully entitled to such payments.

## COUNT TWO

(Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962 (d))

181.  Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

182.  Defendants have conspired to use or invest income derived from a pattern of racketeering activity along with each other, all in violation of 18 USC § 1962 (d)

183.  Plaintiff has suffered injury and financial damage to her property by reason of Defendant's conspiracy.

## COUNT THREE

(Racketeer Influenced and Corrupt Organizations Act 18 USC § 1962 (c)).

184.  Plaintiff repeats, re-alleges and incorporates by reference all of the above allegations.

185.  The association in fact of the Defendants is an enterprise engaged in, and whose activities affect, foreign and interstate commerce within the meaning of 18 U.S.C §§ 1961(4) and 1962.

186.  The enterprise exists separate and apart from the pattern of racketeering alleged.

187.  Defendants conducted or participated, directly and/or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C § 1962(c).

188.  The conspiracy was agreed upon between Defendants wherein Defendants FAL and GPCB perpetuated the false, fraudulent, and deceitful foreclosure filings for years.

189.  The other named Defendants agreed to the conspiracy of the fraudulent foreclosure filings scheme and the collection of unlawful debt by using their computers, phones and wires to distribute to Plaintiff and the judiciary the false, fraudulent and deceitful foreclosure filings and false county clerk recordings and other documents including false assignments.

190.  Plaintiff has sustained injury and financial damage to her property as a direct and proximate result of the acts of Defendants and the enterprise through the pattern of racketeering and collection of unlawful debt.

## COUNT FOUR

(Wire Fraud)

191. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

192. Defendants' accomplished and completed their fraudulent scheme to defraud Plaintiff, the public and judiciary by using the wires via e-mail, the web and faxing their fraudulent foreclosure documents, false affidavits and related letters in violation of 18 USC §. 1343 wherein the transmissions were made in and left the State of Illinois between all named Defendants and to the public, Plaintiff, the judiciary, courts, and other persons who filed the fraudulent foreclosure documents.

## COUNT FIVE

### (Fraud and Deceit)

193. Plaintiff repeats. Re-alleges and incorporates by reference the above factual allegations.

194. Defendant's scheme obstructs justice by corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct and impede the due administration of justice in fraudulent foreclosure lawsuits filed and litigated in the United States courts, violating Title 18, USC § 1503.

## COUNT SIX

### (False Oaths)

195. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

196. Defendants made false material declarations under oath in proceedings before and ancillary to courts of the United States in violation of 18 USC § 1623 (a)

## COUNT SEVEN

### (RESPA Violations)

197. Plaintiff repeats, Re-alleges and incorporates by reference the above allegations.

198. Pursuant to 12 USC § 2605 a Lender shall notify the borrower in writing of any sale, transfer or assignment of the mortgage within 15 days of the assignment.

199. Defendants filed legal documents in the foreclosure actions against Plaintiff stating that the Mortgage was assigned to an entity.

200. Plaintiff never received a 15 day notice.

201. Plaintiff demands damages pursuant to 12 USC § 2605 (f) of any actual damages to her, and

any additional damages in an amount not greater than $1,000, and mandatory costs and attorney fees.

## COUNT EIGHT

(Fair Debt Collections Practices Act)

202. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

203. Defendants violated the FDCPA, which broadly prohibits unfair or unconscionable collection methods, conduct which harasses, oppresses or abuses any debtor, and any false, deceptive or misleading statements in connection with the collection of a debt. Defendants' violations include, but are not limited to the following:

204. Defendants HSBC, FAL and were and are debt collectors under the FDCPA.

205. Defendants served Plaintiff with collection letters for debts they had no right to collect.

206. Defendants filed false and fraudulent legal documents in the courts and county clerks' office to collect a debt they had no standing to collect.

207. Defendants deceived Plaintiff into believing she owed a debt because of legal documents that were actually unlawful.

208. Defendants FAL violated the FDCPA § 812 by creating the false belief in Plaintiff as a consumer of mortgage products that a debt was owed to an entity when in fact that entity was not owed money in violation of § 1692e including by threatening foreclosure action for a party when a debt was not owed to that party and threatening to take and taking legal action on behalf of that party that was fraudulent: and § 1692j by filing complaints and serving other papers falsely indicating a party is owed a debt that is not a real party in interest.

209. Defendants FAL, GPCB, and the other Doe Defendants intentionally, frequently and persistently employed false and misleading affidavits in order to collect from Plaintiff a debt which they knew was not owed.

## COUNT NINE

(The Civil Rights Act, Racial Discrimination, 42 U.S.C §§ 1981, 1982 et seq.)

This count is against Defendants HSBC

210. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

211.   The Civil Rights Act of 1866 and 1870. And later expanded through 1991, prohibits racial discrimination in the formation of contracts, and intentional interference to purchase and hold real property.

212.   Defendants intentionally discriminated against Plaintiff by charging her higher interest rates than those charged to similarly situated Caucasian mortgagees.

213.   Defendant's actions violate 42 U.S.C. §§ 1981 and 1982.   As a proximate result of Defendant's systemic violations of this statute, Plaintiff is entitled to the requested relief provided under the Act

## COUNT TEN

(Fair Housing Act- 42 U.S.C. §§ 3601 et seq.)

This count is against Defendants HSBC

214.   Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

215.   The Fair Housing Act was first enacted in 1968 to prohibit discrimination in connection with real estate transactions including home purchasing and refinancing.   The Act has been broadly construed by the Courts to make effective its provisions to protect consumers,

216.   The Act prohibits mortgage lenders from imposing different terms or conditions on a loan such as different interest rates, points or fees on the basis of race. Defendants targeted Plaintiff, an African American, for higher cost subprime mortgage loan, while directing Caucasian applicants, with the same qualifications after accounting for risks, into lower cost loans.

217.   In addition or in the alternative, under the guise of   purportedly facially neutral subprime loan policies and practices, Defendants actions had a discriminatory effect and created statistical disparities so great between African Americans and Caucasian mortgagee as to be functionally equivalent to intentional discrimination,

218.   By the actions described above, Defendants have violated 42 U,S,C, §§ 3601, 3604 and 3605. 3605 states that it shall be unlawful for any person or entity whose business includes engaging in residential real estate transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction, because of race. Plaintiff is subjected to these discriminatory practices as alleged pursuant to the discriminatory loan

servicing practices on grossly unfavorable terms. Therefore, as a proximate result of

Defendant's systemic violations of this statute, Plaintiff is entitled to the requested relief

provided under the Act. If not enjoined from such violations by the courts, Defendants will

continue to engage in conduct that disregards Plaintiff's rights and causes her irreparable harm

### COUNT ELEVEN

(Violation of the Home Ownership and Equity Protection Act)

219. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations.

220. Loans are covered under HOEPA if the points and fees exceed 8% of the total loan amount. 15 U.S.C. §1602 (aa).

221. Points and fees on Plaintiff's loan exceeded 8% of the total loan amount.

222. As such, the lender was required to provide plaintiff with a notice three or more days before closing, including cautionary language and specified information on the loan terms. 12 C.F.R. § 226.32.

223. Plaintiff never received such a notice giving rise to an extended three year right to rescind.

224. Plaintiff has exercised this right to rescind within the three year statute of repose on or about May, 1 2006.

### COUNT TWELVE

(VIOLATION OF THE ILLINOIS INTEREST ACT 815 ILCS 205/4(2)(a) et seq.)

This count is against Defendants HSBC

225. Plaintiff repeats, re-alleges and incorporates by reference the above factual allegations

226. 815 ILCS 205/4(2)(a) provides

**Whenever the rate of interest exceeds 8% per annum on any written contract, agreement or bond for deed providing for the installment purchase of real estate, or on any loan secured by a mortgage on residential real estate, it shall be unlawful to provide for a prepayment penalty.**

227. Plaintiff's Note is governed by HOEPA, and Defendant's are subject to HOEPA assignee liability for violations of the Interest Act.

228. The interest rate on Plaintiff's Note exceeds 8%, provides for a prepayment penalty if the loan is paid early, and imposes numerous other prepayment charges.

229. Defendant's knowingly contracted for and/ or received interest in violation of 4 (2)(a).

230. Plaintiff is entitled to statutory damages as provided in Sect 6 of the Interest Act, 815 ILCS 205/6.

231. Wherefore, plaintiff requests that the Court enter judgment in her favor and against Defendants HSBC for: Statutory damages, Attorney's fees, litigation expenses and costs of suit and such other and further damages as the court deems equitable, just and proper.

## COUNT THIRTEEN

### (VIOLATION OF THE ILLINOIS INTEREST ACT 815 ILCS 205/5)

232. Plaintiff repeats re-alleges and incorporates by reference the above factual allegations.

233. From September 1, 2003 through at least February, 2005, Defendants HSBC through subterfuge collected unlawful interest from Plaintiff in the guise of tax and hazard insurance payments.

234. At closing of the May 29, 2003, loan transaction, an escrow account was established for the payment of taxes and insurance. After Defendants HSBC took over servicing of the loan, no part of Plaintiff's monthly mortgage payment actually went into the escrow account.

235. Plaintiff paid $100.00 per month for payment of taxes as they became due, however Defendants HSBC did not pay the taxing authority as taxes became due. Defendants retained the payment and as such the payment constituted unlawful interest payments received by Defendants in violation of Section 5 of the Interest Act.

236. Plaintiff paid about $66.00 per month for payment of hazard insurance. However, Defendants did not pay hazard insurance as it became due out of the escrow funds.

237. The $100.00 monthly tax payment and the $66.00 hazard insurance both constitute the knowing receipt of unlawful interest in violation of Section 5 of the Illinois Interest Act.

238. Defendants HSBC collected unlawful interest in the form of late fees by charging more than one late fee for a single missed payment in violation of the interest act and charged late fees after the loan had been accelerated when no more late fee were due, in violation of the interest act.

239. Plaintiff is entitled to statutory damages as provided in Section 6 of the Interest Act.

240. Wherefore Plaintiff requests that the Court enter judgment in her favor and against Defendants

HSBC for statutory damages, Attorney fees, litigation expenses and costs of suit and such
other and further damages as the court deems just and proper.

**COUNT FOURTEEN**

(Truth in Lending Act (TILA) (15 U.S.C. § 1635 (f) and for damages pursuant to 15 U.S.C § 1640.)

Against Defendants HSBC and MERS

234    Plaintiff repeats, re-alleges and incorporates by reference the above allegations

235.   The May, 29, 2003 refinance transaction was secured by plaintiff's home, and was not entered

       into for purposes of the initial acquisition or construction of that home, it was subject to the right

       to rescind provided by 15 U.S.C. §1635 and 12 C.F.R. § 226.23.

       On May 1, 2006, within three years of the loan transaction, Defendants, through their attorney,

       received Plaintiff's notice that she was exercising her right to rescind the loan.

241.   On May 26, 2006. Within one year of Defendants failure to rescind, Plaintiff referenced her

       notice of rescission ( as part of her counterclaim filed with the court on that date in case 2) and

       notified Defendants that she was seeking damages under §1640 by stating "Please be advised

       that if you do not cancel the security interest and return all consideration paid by myself as set

       forth above, you will be responsible for additional actual and statutory damages pursuant to 15

       U.S.C § 1640 (a)"

242.   12 C.F.R. § 226.23 (d)(1) provides in pertinent part, that rescission is automatic upon the

       consumer's notice. ("When a consumer rescinds a transaction, the security interest giving rise

       to the right of rescission becomes void and the consumer shall not be liable for any amount,

       including any finance charge.")

243.   On May 1, 2006, when Defendant's received her notice that she was canceling the loan,

       Defendant's ignored the notice and did not cancel the loan.

244.   As grounds for rescission, the lender had failed to properly disclose the actual amount financed

       in violation of 15 U.S.C § 1605, 12 C.F.R § 226.4 and 12 C.F.R § 226.18 (d) and had misstated

       the "Finance Charge" in violation of 15 U,S.C. § 1638(a)(4) and 12 C.F.R. § 226.18 (e) and 12

       C.F.R, § 226.18 (d).

245.   The rescission remedy runs against the original lender and against any subsequent holder of

the loan, 15 U.S.C. § 1641 (c).

246. Defendants herein have failed to take any action to rescind the loan and have therefore committed an additional violation of 15 U.S.C § 1635 and 12 C.F.R. § 226.23. and is therefore liable for an additional award of damages based upon that violation.

247. Wherefore, this court should:

    (a) Require plaintiff to take any and all necessary steps to reflect the voiding of its security interest;

    (b) Grant such other and further and different relief as the Court deems just equitable and proper.

## COUNT FIFTEEN

### (PUNITIVE DAMAGES)

248. Plaintiff repeats, re-alleges and incorporates by reference the above paragraphs.

249. Defendants Lindberg, Pilgrim, and Norman and their attorney associates, as licensed attorneys, are held to a high standard of honesty.

250. Defendants' fraud and other misconduct upon the public and the judiciary for their financial benefit is reprehensible, outrageous, and demands serious punitive damages to stop Defendants from further harming the Plaintiff, the public and deceiving the judiciary.

251. Defendants' conduct described herein was done with conscious disregard of Plaintiffs' rights to her property, to a fair hearing and her right to due process. The fraudulent schemes and unlawful collection procedures were done with the intent to vex, injure or annoy Plaintiff as to constitute oppression, fraud or malice, entitling Plaintiff to an award of punitive damages in an amount appropriate to punish or set an example of Defendants.

## PRAYER FOR RELIEF

252. WHEREFORE, Plaintiff prays for relief as follows

(a) Plaintiff requests that the aforesaid conduct of Defendants be adjudged and declared to be in violation of RICO, 18 U.S.C § 1961 et seq., and that judgment be entered for Plaintiff and against Defendants for threefold the amount of damages sustained by Plaintiff together with the costs of this action, including reasonable attorney fees:

(b) That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of the common law statutes of Illinois and that judgment be entered for Plaintiff and against Defendants for the amount of damages determined to have been sustained by her or otherwise allowed by law, together with punitive damages to punish Defendants and deter them from future misconduct, multiple damages where authorized by statute, and costs of this action, including reasonable attorney's fees.

(c) That Defendants, their subsidiaries, successors, transferees, assignees, and their respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or reviving the unlawful collection activities and other unlawful conduct alleged herein in any respect.

(d) That reasonable attorney fees and costs of the suit be granted to Plaintiff.

(e) That punitive damages be granted to Plaintiff.

(f) That compensatory damages, restitution and all allowable damages be granted to Plaintiffs regarding the FDCPA, RESPA, T.I.L.A, FHA, CIVIL RIGHTS VIOLATIONS, Illinois Interest Act Violations, Fraud and other violations alleged herein above: and

(g) That Plaintiff receive such other, further and different relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands trial by Jury

**VERIFICATION**

I, Eloise Lockhart, an attorney and the Plaintiff in the above- captioned case, hereby certify, under oath that I have read the above Verified Complaint and that I believe that every paragraph of it is true to the best of my knowledge and belief.

I further certify that I personally prepared all of the Exhibits attached to the above complaint and that all of the exhibits thereto are true and correct electronically scanned copies of the originals, with nothing omitted.

Dated: December 27, 2013
Irving, Texas

Eloise Lockhart , Pro-se Plaintiff

*Exhibit 1*

# Congress of the United States
## Washington, DC 20515

April 10, 2013

The Honorable Ben Bernanke
Chairman
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551

The Honorable Thomas Curry
Comptroller of the Currency
Administrator of National Banks
Washington, DC 20219

Dear Chairman Bernanke and Comptroller Curry:

We are writing to urge you to reconsider the position relayed by your staff at a meeting yesterday that you will not provide any documents in response to our January 31, 2013, request as Members of Congress relating to systemic and widespread violations of law committed by mortgage servicing companies.

Two years ago this week, your offices issued a public report announcing that you determined that 14 mortgage servicing companies were engaging in "violations of applicable federal and state law." You found that these abuses have "widespread consequences for the national housing market and borrowers." You also explicitly referenced instances of abuse, including illegal foreclosures against our nation's men and women in uniform who are protected by the Servicemembers Civil Relief Act (SCRA).

Based on these findings, you issued consent orders requiring these mortgage servicers to retain independent consulting firms to conduct a thorough review of their foreclosure actions in 2009 and 2010. Before this Independent Foreclosure Review (IFR) process was completed, however, and before a single borrower had received remediation, you finalized settlement agreements in February 2013 terminating the review process with 11 of these servicers.

We have requested information about the process used to conduct this review and the extent to which violations of law were found. We made 14 specific requests in our letter to you in January, and to date you have provided only one full response, three partial or minimal responses, and no responses to nine of the requests (see Appendix A). You have provided little specific information on what the review actually found, such as the number of improper foreclosures, the amount and number of instances of inflated fees, or the extent of abusive practices by each mortgage servicer.

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 2

You have, however, provided several salient facts: (1) mortgage servicing companies spent approximately $2 billion on this review; (2) although more than 800,000 loan files were identified for review, only about 114,000 were reviewed by independent consultants by the end of 2012; and (3) remediation will be paid to injured borrowers starting at the end of this week, though the remedial compensation is not based directly on findings from the review.

At the meeting yesterday, Federal Reserve staff argued that the documents relating to widespread legal violations are the "trade secrets" of mortgage servicing companies. In addition, staff from the Office of the Comptroller of the Currency (OCC) argued that these documents should be withheld from Members of Congress because producing them could be interpreted as a waiver of their authority to prevent disclosure to the public of confidential supervisory bank examination information.

We strongly believe that documents should not be withheld from any Member of Congress based on the flawed argument that illegal activity by banks is somehow their proprietary business information. Breaking the law is not a corporate trade secret. As regulators, you identified systemic and widespread abuses two years ago, and concealing important information about these violations limits our ability to fulfill our responsibility to conduct oversight over the actions of mortgage servicing companies and to develop legislation to protect our constituents from further abuse.

The position conveyed by your staff is even more troubling given that the abuses you identified are apparently more widespread than previously known. For example, one press account recently reported that the review found that "the nation's biggest banks wrongfully foreclosed on more than 700 military members during the housing crisis."[1] On Tuesday, however, your staff informed us that more than 1,000 servicemembers will receive compensation under the settlement for actual or potential SCRA violations involving illegal foreclosures. Despite these violations, your staff refused repeatedly to identify the number of servicemembers illegally foreclosed on by each mortgage servicer. In fact, your staff refused to identify information about any illegal activities by any specific mortgage servicer.

Your staff also stated that the performance of one of the independent consultants conducting foreclosure reviews was so poor that you issued a letter faulting the company and directing it to cure its deficiencies. Your staff would not elaborate, however, and they declined to identify the independent consultant or the mortgage servicing company involved.

Last week, the Government Accountability Office (GAO) issued a report finding that the "[c]omplexity of the reviews, overly broad guidance, and limited monitoring for consistency impeded the ability of the Office of the Comptroller of the Currency (OCC) and the Board of

---

[1] *Banks Find More Wrongful Foreclosures Among Military Members*, New York Times (Mar. 3, 2013) (online at http://dealbook.nytimes.com/2013/03/03/banks-find-more-wrongful-foreclosures-among-military-members/).

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 3

Governors of the Federal Reserve System (Federal Reserve) to achieve the goals of the foreclosure review." The report concluded that "limited communication with borrowers and the public adversely impacted transparency and public confidence."[2]

Although we do not know the extent to which you were involved in your staff's preparation for yesterday's meeting, it is our sincere hope that we can work toward an accommodation that is mutually acceptable and serves the interests of both your offices and Members of Congress. The remainder of this letter provides additional background on our requests.

## Findings of Violations of Federal and State Law

Two years ago, your offices concluded that mortgage servicing companies engaged in widespread and systemic violations of federal law. In April 2011, your offices joined the then-Office of Thrift Supervision in issuing a joint report summarizing the results of "horizontal reviews" you conducted of the nation's 14 largest mortgage servicers. The summary stated:

> The reviews found critical weaknesses in servicers' foreclosure governance practices, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys. ... [T]he weaknesses at each servicer, individually or collectively, resulted in unsafe and unsound practices and **violations of applicable federal and state law and requirements**.[3]

The summary also described the widespread nature of these legal violations:

> The results elevated the agencies' concern that widespread risks may be presented—to consumers, communities, various market participants and the overall mortgage market. The servicers included in this review represent more than two-thirds of the servicing market. Thus, the agencies consider problems cited within this report to have **widespread consequences for the national housing market and borrowers**.[4]

---

[2] Government Accountability Office, *Foreclosure Review: Lessons Learned Could Enhance Continuing Reviews and Activities Under Amended Consent Orders* (GAO-13-277) (Apr. 4, 2013) (online at www.gao.gov/products/GAO-13-277).

[3] Federal Reserve System, Office of the Comptroller of the Currency, and Office of Thrift Supervision, *Interagency Review of Foreclosure Policies and Practices* (Apr. 13, 2011) (online at www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf) (emphasis added).

[4] *Id.* (emphasis added).

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 4

In addition, although your staff seemed unaware of it during our meeting yesterday, your 2011 report also identified specific cases of improper foreclosures that violated the SCRA, a federal law with criminal sanctions passed by Congress to provide additional foreclosure protections for members of our military:

> [E]xaminers did note cases in which **foreclosures should not have proceeded** due to an intervening event or condition, such as the borrower (a) was covered by the Servicemembers Civil Relief Act, (b) filed for bankruptcy shortly before the foreclosure action, or (c) qualified for or was paying in accordance with a trial modification.[5]

You also concluded that mortgage servicing companies filed false documents with courts. For example, you found that Bank of America, N.A.:

> filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; ... [and] failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.[6]

To address these widespread and systemic violations of law, you entered into consent orders requiring mortgage servicing companies to retain independent firms to conduct a thorough review of foreclosure actions that were pending from January 1, 2009, through December 31, 2010, to identify as many borrowers as possible who were financially harmed by the banks' deficient practices. You also directed the mortgage servicers to submit for your approval "engagement letters" establishing the terms of the reviews to be conducted by the independent firms, including the specific review methodologies to be employed.[7]

On January 7, 2013, your offices announced that you were suddenly terminating the independent review process for many of the servicers subject to the April 2011 consent orders.[8]

---

[5] *Id.* (emphasis added).

[6] *In the Matter of Bank of America, NA*, Case No.: AA-EC-11-12, *Consent Order* (Office of the Comptroller of the Currency, Apr. 13, 2011) (online at www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf).

[7] *Id.*

[8] Board of Governors of the Federal Reserve System and Office of the Comptroller of the Currency, *Joint Press Release* (Jan. 7, 2013) (online at www.occ.gov/news-issuances/news-releases/2013/nr-ia-2013-3.html).

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 5

On February 28, 2013, formal agreements were executed in which these servicers agreed to pay $9.3 billion in "cash payments and other assistance" to borrowers, including $3.6 billion in direct payments to borrowers who had homes in foreclosure in 2009 or 2010.[9]

Significant questions have been raised by this decision, including the extent of abuses identified during the review and whether the sum the banks agreed to pay was appropriate to fully compensate borrowers for the legal violations committed. At our meeting yesterday, your staff refused to identify the number of violations or errors found during the review process committed by each mortgage servicer that entered into an amended consent order. Your staff also stated that they had not decided whether to provide individual borrowers with information identified during the review process about the harm their own mortgage servicers may have caused so they could seek redress. In addition to providing information about these abuses to Members of Congress, we believe you should disclose to borrowers information in your possession that would help them address the harm they suffered.

### Declining to Produce Documents Relating to Violations of Law

In response to our request for documents relating to violations of law committed by mortgage servicing companies, your staff made two arguments: first, that documents relating to these widespread violations are the "trade secrets" of mortgage servicing companies; and second, that these documents should be withheld from Congress to avoid waiving the authority to withhold bank examination materials from the public. We believe the decision not to provide these documents is a mistake, and we respectfully request that you reconsider your staff's approach.

First, according to the Court of Appeals for the District of Columbia Circuit, the definition of a "trade secret" is:

[A] secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort.[10]

Obviously, this definition does not encompass illegal activity. It would be very surprising indeed if mortgage servicing companies argued that their ability to engage in illegal

---

[9] Board of Governors of the Federal Reserve System and Office of the Comptroller of the Currency, *Joint Press Release* (Feb. 28, 2013) (online at www.federalreserve.gov/newsevents/press/enforcement/20130228a.htm).

[10] *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983) (citing Restatement (First) of Torts § 757 cmt. b (1939) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it").

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 6

foreclosures and charge inflated fees is a commercially viable plan derived from corporate "innovation."

Second, your staff argued that producing these documents to Members of Congress who are not Committee chairs could be viewed as a waiver of your agencies' authority to withhold confidential and proprietary information from the public. This argument is misplaced. You may protect against such a waiver by including standard language in a cover letter explaining that providing documents to Members of Congress, even if normally not disclosed to the public because of their proprietary or confidential nature, does not constitute a waiver.

Other agencies and offices have taken precisely this approach. For example, on May 24, 2012, the Federal Housing Finance Agency (FHFA) provided documents relating to mortgage servicing issues in response to a request from Ranking Member Cummings and Oversight Committee Member John Tierney. In its cover letter, FHFA stated:

> FHFA staff has collected documents responsive to your requests and compiled these in the attached disks. … Materials provided include information related to the Enterprises and to FHFA internal deliberations that, in many cases, fall within the category of proprietary, confidential, non-public information that would not be released by FHFA.[11]

Finally, your staff referenced regulations protecting against public disclosure of "bank examination" and "confidential supervisory information." These regulations make clear that, although you may choose to deny our requests because they do not come with the threat of a Committee subpoena, you have discretion to comply with such requests when they serve the nation's interests, as this one does.[12] These regulations are based on exemptions to the Freedom of Information Act (FOIA), which states that it is "not authority to withhold information from Congress." More than 30 years ago, the Department of Justice issued the following guidance on responding to requests from Members of Congress:

---

[11] Alfred M. Pollard, General Counsel, Federal Housing Finance Agency, to Ranking Member Elijah E. Cummings and Ranking Member John F. Tierney, House Committee on Oversight and Government Reform (May 24, 2012). *See also* Alfred M. Pollard, General Counsel, Federal Housing Finance Agency, to Ranking Member Elijah E. Cummings and Ranking Member John F. Tierney, House Committee on Oversight and Government Reform (Apr. 12, 2012) ("FHFA has collected documents responsive to your request and this production reflects the materials from Fannie Mae and Freddie Mac that relate to the pilot programs. The documents from Fannie Mae and Freddie Mac (Enterprises) contain confidential, proprietary, non-public information that would not be released by the FHFA or the Enterprises.").

[12] *See* 12 C.F.R. § 4.36 (governing OCC discretion to disclose non-public information); and 12 C.F.R. § 261.22 (governing the Federal Reserve's discretion to disclose non-public information).

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 7

> From a policy perspective, there is significant practical importance in maintaining a proper flow of information not only to Congress and its committees and subcommittees but also to individual members. ... Thus, when Members of Congress request information, agencies properly give due weight and sympathetic consideration. The legislator may have a need for access to documents which fall outside the public's right to know under FOIA. The individual member may seek information in his or her official capacity to assist a constituent, to develop and decide on proposed legislation, or to participate in the work of committees or subcommittees to which the member may belong or before which the member may appear. An agency should not lightly deny a request even for records exempt under FOIA if the member of Congress needs the records to carry out an official function.[13]

In updating those guidelines several years later, the Department advised that releasing information to Members of Congress does not impact the ability to use applicable FOIA exemptions in response to other requests:

> Recognizing the importance of federal information flow to effective congressional relations, Executive Branch agencies should of course give very careful consideration to any access request received from a Member of Congress, with discretionary disclosure often a possibility. And where an agency makes such a discretionary disclosure in furtherance of a legitimate governmental interest, together with careful restrictions on further dissemination, it should be able to resist an argument that such action constitutes a "waiver" of FOIA exemptions.[14]

### GAO Study Finds Extensive Flaws with IFR Process

Last week, GAO issued a report describing significant flaws with the design and implementation of the IFR, as well as a lack of transparency that has undermined confidence in its findings. For example, although the independent consultants were directed "to identify as many harmed borrowers as possible and ensure similar results for similarly situated borrowers," GAO warned that "regulators' limited monitoring of consistency of the consultants' sampling methodologies and review processes" actually "risked not achieving the intended goals." GAO warned that "this remains a challenge for the servicers continuing the foreclosure review." Specifically, GAO concluded:

---

[13] Department of Justice, Office of Information Policy, *Release of Exempt Information to Members of Congress: The Impact of the Murphy Decision*, FOIA Update, Vol. I, No. 4 (1980) (online at www.justice.gov/oip/foia_updates/Vol_I_4/page3.htm).

[14] Department of Justice, Office of Information Policy, *Congressional Access Under FOIA*, FOIA Update, Vol. V, No. I (1984) (online at www.justice.gov/oip/foia_updates/Vol_V_1/page3.htm).

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 8

Our analysis found that the regulators' sampling approach did not include mechanisms to facilitate their oversight of the extent to which consultants would have reached as many harmed borrowers as possible. For example, the regulators' sampling approach did not provide an objective method for regulators to use in determining if consultants had conducted sufficient reviews and could stop their review activities, except in those cases where there were few or no errors. …

In addition, the regulators' sampling approach did not provide a clear mechanism for regulators to assess the extent to which consultants had identified the appropriate high- and low-risk loan categories to confirm that those categories were accurate and to signal if there were additional potential high-risk loan categories that had not been identified, but warranted additional sampling and review.[15]

As your staffs conceded yesterday, foreclosure reviews for 11 mortgage servicers have now been terminated even though only a fraction of the files identified for review have been completed and even though the sampling techniques and oversight methodologies have not enabled regulators to determine the full extent of harm suffered by borrowers.

Despite these deficiencies, GAO reported that now, "[u]sing a framework provided by regulators and characteristics of borrowers' loans, **servicers will categorize borrowers, and regulators will develop a distribution plan and direct a payment administrator to distribute cash payments.**"[16] In other words, the same mortgage servicers that you determined had engaged in widespread abuses are now placing borrowers into categories to receive remediation based on a review process that GAO has found to be deeply deficient.

GAO reported that your offices "did not describe plans to release additional information about the procedures servicers are using to categorize borrowers" and stated that "neither regulator had made decisions about what information to provide to borrowers."[17] In addition, as your staffs conceded yesterday, borrowers will have no mechanism by which to contest their placement in a certain category or the level of remediation offered to them.

GAO proposed significant changes going forward, recommending that your offices "identify and apply lessons from the foreclosure review process, such as enhancing planning and monitoring activities to achieve goals, as they develop and implement the activities under the amended consent orders." GAO also warned: "Absent a clear strategy to guide regular communications with individual borrowers and the general public, regulators face risks to transparency and public confidence similar to those experienced in the foreclosure review."

---

[15] Government Accountability Office, *Foreclosure Review: Lessons Learned Could Enhance Continuing Reviews and Activities Under Amended Consent Orders* (GAO-13-277) (Apr. 4, 2013) (online at www.gao.gov/products/GAO-13-277).

[16] *Id.* (emphasis added).

[17] *Id.*

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 9

## **Conclusion**

Given the circumstances of this case—in which your offices have identified systemic and widespread violations of federal law, including wrongful foreclosures, excessive fees, and fraudulent affidavits filed in court—access by Members of Congress to additional information about these violations is not only warranted, but imperative. For these reasons, we hope that you will reconsider your staff's positions and work with us to achieve a mutually agreeable accommodation that serves both of our interests. Thank you for your continued assistance.

Sincerely,

Elizabeth Warren
Senator

Elijah E. Cummings
Member of Congress

cc:    The Honorable Tim Johnson, Chairman, Senate Committee on Banking, Housing and Urban Affairs

The Honorable Mike Crapo, Ranking Member, Senate Committee on Banking, Housing and Urban Affairs

The Honorable Sherrod Brown, Chairman, Subcommittee on Financial Institutions and Consumer Protection

The Honorable Pat Toomey, Ranking Member, Subcommittee on Financial Institutions and Consumer Protection

The Honorable Robert Menendez, Member, Senate Committee on Banking, Housing and Urban Affairs

The Honorable Darrell E. Issa, Chairman, House Committee on Oversight and Government Reform

The Honorable Jeb Hensarling, Chairman, House Committee on Financial Services

The Honorable Maxine Waters, Ranking Member, House Committee on Financial Services

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 10

## Appendix A

| Warren/Cummings Request | Federal Reserve/OCC Response |
|---|---|
| 1. **Performance reviews:** The results of all performance reviews conducted by the Federal Reserve or the OCC over the Independent Foreclosure Review, including:<br>    a. all documents reviewing the performance of each of the independent contractors engaged by mortgage servicers to conduct reviews of borrower files under the terms of the consent orders issued in April 2011,<br>    b. all documents detailing the nature of any instances of unsatisfactory performance found by the Federal Reserve or the OCC,<br>    c. all documents detailing any corrective actions ordered by the Federal Reserve or the OCC to be taken by any mortgage servicer subject to the April 2011 consent orders or by any independent contractor conducting borrower file reviews, and<br>    d. all documents describing the adequacy of any corrective action taken by any mortgage servicer subject to the April 2011 consent order or by any independent contractor engaged to review borrower files; | 1. *No response*.<br><br>1a. *No response*.<br><br>1b. *No response*.<br><br>1c. *No response*.<br><br>1d. *No response* |
| 2. **Updates to OCC/Fed from servicers and consultants:** All documents and reports prepared by the mortgage servicers subject to the April 2011 consent orders or the independent contractors engaged by mortgage servicers to conduct reviews of borrower files under the terms of the consent orders issued in April 2011, describing, reviewing, or updating on the Independent Foreclosure Review process, and supplied to the OCC or the Federal Reserve; and, | 2. *No response*. |
| 3. **Amounts paid to consultants:** All documents compiled by the Federal Reserve or the OCC indicating the total amount of settlement funds paid to each independent contractor engaged by the 14 mortgage servicers subject to the April 2011 consent orders and all documents compiled by the Federal Reserve or the OCC indicating itemizations of specific work performed by each contractor. | 3. *Minimal response*: The OCC and Fed have disclosed the total amount spent on the consultants - $2 billion -- but no documents have been provided that detail the amount paid to each contractor or that itemize the specific work performed by each |

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 11

| | |
|---|---|
| | contractor. |
| 4. **Information on borrowers:** The total number of eligible borrowers who requested reviews of their foreclosure files by gender, race, zip code, and property value | 4. _Minimal response_: The OCC and Fed have disclosed the total number of eligible borrowers who requested reviews and, in September 2012, the Federal Reserve and the OCC released county-by-county data on (1) borrowers mailed a form to request a file review and (2) borrowers who submitted a request for review up to that date. However, no data broken down by gender, race, zip code, and property value have been provided. |
| 5. **IFR findings:** The total number of reviews of borrower files initiated by each of the independent contractors engaged by the 14 mortgage servicers subject to the April 2011 consent orders, including<br>   a. the number of reviews completed by January 7, 2013 by each independent contractor,<br>   b. the number of borrower files in which unsafe or unsound practices were found,<br>   c. the amount of remediation each borrower who experienced an unsafe or unsound practice was recommended to receive, and<br>   d. the amount of remediation paid out to borrowers as part of the Independent Foreclosure Review process; and | 5. _Partial response:_ The OCC and Fed have disclosed the total number of borrower files identified for review – 744,685 – but these have not been broken down by consultant.<br><br>5a. _Partial response:_ The OCC and Fed have identified the total number of reviews completed – 103,820 – but these have not been broken down by consultant.<br><br>5b. _No response_.<br><br>5c. _No response_.<br><br>5d. _Full response._ The OCC and Fed have indicated that no remediation has been paid out. |

The Honorable Ben Bernanke
The Honorable Thomas Curry
Page 12

| | |
|---|---|
| 6. **Consultant time spent per file:** The average time each independent contractor engaged by the 14 mortgage servicers subject to the April 2011 consent orders required to complete a review of a borrower's file. | 6. _No response_. |

1486132317

Return To:

FIELDSTONE MORTGAGE COMPANY
11000 BROKEN LAND PKWY, #600
COLUMBIA, MD 21044
Prepared By:

      PATRICK MCGINLEY
      FIELDSTONE MORTGAGE COMPANY

---------------------------- [Space Above This Line For Recording Data] ----------------------------

# MORTGAGE

MIN

100052614861323171

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     May 29, 2003
together with all Riders to this document.
(B) "Borrower" is

ELOISE X. LOCKHART, SINGLE,

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3014 1/01

-6A(IL) (0005)
Page 1 of 15     Initials:
VMP MORTGAGE FORMS - (800)521-7291

(D) "Lender" is **FIELDSTONE MORTGAGE COMPANY**

Lender is a **CORPORATION**
organized and existing under the laws of **MARYLAND**
Lender's address is **11000 BROKEN LAND PKWY, #600**
**COLUMBIA, MD 21044**

(E) "Note" means the promissory note signed by Borrower and dated **May twenty-ninth, 2003**
The Note states that Borrower owes Lender
**ONE HUNDRED FIVE THOUSAND & 00/100**
**Dollars**
(U.S. $ **105,000.00**     ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **JULY 1, 2033**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.

-6A(IL) (0010)                          Page 2 of 15                 Initials: _EL_                 Form 3014  1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the          COUNTY
[Type of Recording Jurisdiction]  of      Cook                                                [Name of Recording Jurisdiction]:

All that tract or parcel of land as shown on Schedule "A" attached
hereto which is incorporated herein and made a part hereof.

Parcel ID Number:   2031107039 & 2031107038                    which currently has the address of
                                                                                         [Street]
2020 WEST 80TH STREET
CHICAGO                                                      [City] , Illinois 60620          [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010)                          Page 3 of 15              Initials: _____          Form 3014 1/01

1486132317

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of

-6A(IL) (0010)                    Page 4 of 15              Initials: _EU_              Form 3014  1/01

1486132317

Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

1486132317

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the

VMP®-6A(IL) (0010)                     Page 6 of 15               Initials: _____                Form 3014  1/01

1486132317

excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(IL) (0010)                                    Page 7 of 15            Initials: _____            Form 3014  1/01

1486132317

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

1486132317

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

1486132317

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments form third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

1486132317

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

1486132317

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

1486132317

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Initials: _EX_

-6A(IL) (0010)     Page 13 of 15     Form 3014  1/01

1486132317

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        x _Clair Lockhart_ (Seal) 5-29-03
                                          ELOISE N. LOCKHART        -Borrower

_____        _____ (Seal)
                                                                       -Borrower

_____ (Seal)  _____ (Seal)
                         -Borrower                                     -Borrower

_____ (Seal)  _____ (Seal)
                         -Borrower                                     -Borrower

_____ (Seal)  _____ (Seal)
                         -Borrower                                     -Borrower

VMP -6A(IL) (0010)              Page 14 of 15              Form 3014  1/01

1486132317

STATE OF ILLINOIS, *the undersigned* _Depart_ County ss:
I, , a Notary Public in and for said county and
state do hereby certify that *Eloise Lockhart*

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
Given under my hand and official seal, this 29th day of May 2003

My Commission Expires:
3/26/05

Notary Public

"OFFICIAL SEAL"
ROBERT REDING
Notary Public, State of Illinois
My Commission Expires 3/26/2005

-6A(IL) (0010) Page 15 of 15 Initials: *EL* Form 3014 1/01

*Exhibit 3*

April 29, 2006

**via certified mail**

MERS INC As Nominee
For Household Finance Corporation III
c/o Freedman Anselmo Lindberg & Rappe LLC
1807 W. Diehl RD., Suite 333
Naperville, IL 60563-1890

**RE: MERS, AS NOMINEE for HOUSEHOLD FINANCE CORP. III V. ELOISE
LOCKHART. 05 CH 13290**

To Whom It May Concern:

In the action referenced above, your client has filed a foreclosure complaint against me based on a loan I entered into with Fieldstone Mortgage Inc., on May 29, 2003. I hereby exercise my right to rescind that transaction pursuant to the Federal Truth in Lending Act, 15 U.S.C. § 1635 and 12 C. F.R.§226.23.

In entering into this loan transaction, the original lender, Fieldstone Mortgage Inc., violated the Truth in Lending Act by:

1. Failing to properly disclose the actual amount financed as required by 15 U.S.C. §§ 1605(a) and 12 C.F.R. §§ 226.4 and 226.18(d); and

2. Misstating the Annual Percentage Rate and Finance charge in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. §226.18 (e) and 12 C.F.R. §226.18(d).

These violations entitle me to rescind the loan (regardless of the identity of the current holder of the loan). 15 U.S.C. §§ 1635(i)(l), 1639(j), and 1641(c).

Pursuant to this rescission letter, the security interest held by MERS., as Nominee for Household Finance Corporation III is hereby void. 15 U.S.C. § 1635 and 12 C.F.R. §226.23. Household finance Corporation III has twenty days after receipt of this notice of rescission to return to me all monies paid by me and to take whatever action is necessary to reflect the termination of the security interest in the property commonly known as 2020 W. 80th Street, Chicago, Illinois 60620.

Please be advised that if you do not cancel the security interest and return all consideration paid by myself as set forth above, you will be responsible for additional actual and statutory damages pursuant to 15 U.S.C. § 1640(a). If Household Finance is not the true holder of this Note, I hereby demand that Household Finance identify the true holder of the Note so that this rescission notice may be forwarded accordingly.

Sincerely,

Eloise Lockhart
Attorney at Law

cc: Fieldstone Mortgage Inc.

*Exhibit 4*

Document Prepared By:
Liz Pronato
WHEN RECORDED, PLEASE RETURN TO:
LAW OFFICES
**FREEDMAN ANSELMO LINDBERG & RAPPE, LLC**
1807 WEST DIEHL ROAD  SUITE 333  P.O. BOX 3107
NAPERVILLE, ILLINOIS 60566-7107
(630) 983-0770

Loan #: 7357643
Investor Loan #:
Assignee Loan #:
Pool #:
PIN/Tax ID #: 2031107039; 203110 7038
Property Address:
**2020 WEST 80TH STREET**
**CHICAGO, IL 60620**

Doc#:  0601827045  Fee: $26.50
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/18/2006 10:56 AM  Pg: 1 of 2

This space for Recorder's Use On

## ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged **Mortgage Electronic Registration Systems, Inc., A CORPORATION**, whose address is **P.O. BOX 2026, FLINT, MI 48501-2026**, does by these presents hereby grant, bargain, sell, assign, transfer, convey, set over and deliver unto **HOUSEHOLD FINANCE CORPORATION III, A CORPORATION** whose address is **577 LAMONT ROAD, ELMHURST IL 60126**, the following described mortgage (the "Mortgage"), together with the certain promissory note(s) described therein (the "Notes(s)"), together with all rights therein and thereto, all liens created or secured thereby, and any and all interest due or to become due thereon.

State of Recordation: **Illinois**          Recording Jurisdiction: **COOK**

Recording Book:          Page:          Document No: **0315726217**

Recording Book2:          Page2:          Document No2:

Recording Date: **06-06-2003**          Certificate No.:

Original Mortgagor(s): **ELOISE A. LOCHART, SINGLE**

Original Mortgagee: **FIELDSTONE MORTGAGE COMPANY**

Date of Mortgage: **05-29-2003**          Original Loan Amount: **$105,000.00**

Comments:  SEE Attached legal description

IN WITNESS WHEREOF, the undersigned entity by its Board of Directors or by all due authority has caused this instrument to be executed by its duly authorized officer(s), representative(s) or Attorney-in-Fact this date of **01/12/2006**.  Date of Transfer:

**NAOMI GARNER**
**ASSISTANT SECRETARY**
State of **IL**          County of **COOK**

**Mortgage Electronic Registration Systems, Inc.**

**BRIAN DAHLIN**
**VICE PRESIDENT**

On this date of **01/12/2006**, before me, the undersigned authority, a Notary Public duly commissioned, qualified and acting within and for the aforementioned State and County, personally appeared the within named **BRIAN DAHLIN** and **NAOMI GARNER**, known to me (or identified to me on the basis of satisfactory evidence) that they are the **VICE PRESIDENT** and **ASSISTANT SECRETARY** respectively of **Mortgage Electronic Registration Systems, Inc., A CORPORATION**, and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and on behalf of said corporation and that said corporation executed the same, and further stated and acknowledged that they had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

Witness my hand and official seal on the date hereinabove set forth.

Notary Public: **DEVIKA BUSTILLOS** My Commission Expires: **02-26-2009**

**"OFFICIAL SEAL"**
**DEVIKA BUSTILLOS**
Notary Public, State of Illinois
My Commission Expires 02/26/09

LOTS 39 AND 40 IN BLOCK 4 IN SWEET, COLE AND BUELLS
SUBDIVISION OF LOTS 1 AND 2 OF HUNTERS SUBDIVISION OF THE
NORTH WEST 1/4 OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 14,
EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.

PERMANENT TAX NUMBER: 20-31-107-039-0000 (Lot 40); 20-31-107-
038-0000 (Lot 39)

*Exhibit 5*

Doc#. 1120008241 fee: $46.00
Date: 07/19/2011 11:47 AM Pg: 1 of 2
Cook County Recorder of Deeds
*RHSP FEE $10.00 Applied

Recording Requested By:
HSBC MORTGAGE SERVICES

When Recorded Return To:

ASSIGNMENTS
HSBC MORTGAGE SERVICES
2929 WALDEN AVE
DEPEW, NY 14043

## CORPORATE ASSIGNMENT OF MORTGAGE

Cook, Illinois
SELLER'S SERVICING #:7357643 "LOCKHART"

MERS #: 100052614801323171  SIS #: 1-888-679-6377

Date of Assignment: July 19th, 2011
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIELDSTONE MORTGAGE COMPANY, "ITS SUCCESSORS AND ASSIGNS" at 1595 SPRING HILL RD, STE 310, VIENNA, VA 22182
Assignee: HOUSEHOLD FINANCE CORP III at 2929 WALDEN AVE, DEPEW, NY 14043

Executed By: ELOISE LOCKHART, SINGLE  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC AS NOMINEE FOR FIELDSTONE MORGAGE COMPANY
Date of Mortgage: 05/29/2003 Recorded: 08/06/2003  In Book/Reel/Liber: NA Page/Folio: NA as Instrument No : 0315726217 in the County of Cook, State of Illinois.

Assessor's/Tax ID No. 20-31-107-039-0000

Property Address: 2020 W 80TH STREET, CHICAGO, IL  60620

Legal:  LOTS 39 AND 40 IN BLOCK 4 IN SWEET, COLE AND BUELLS SUBDIVISION OF LOTS 1 AND 2 OF HUNTERS SUBDIVISION OF THE NORTHWEST 1/4 OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY ILLINOIS.


  KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $105,000.00 with interest, secured thereby, with all moneys now owing or that may hereafter become due and owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

  TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

DK T BK 3,399 PG 607

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF New York
COUNTY OF Erie

On January 31st, 2012, before me, DANIEL HERINGTON, a Notary Public in and for Erie in the State of
New York, personally appeared ALLAN KEOHANE Assistant Secretary, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

DANIEL HERINGTON
Notary Expires: 09/22/2012  #01HE6193739
Qualified in Erie County



(This area for notarial seal)

*LMZ*LMZHSBI*01/31/2012 01:11:28 PM* HSBI02HSBIA0000000000000000784621* MSDE SO*
0011934973 MSSTATE_TRUST_ASSIGN_ASSN **LMZHSBI*